# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

JOY BILLINGS,            )
                         )
    Appellant,         )
                         )
      v.              )      C.A. No. N14A-03-011FWW
                         )
                         )
MERIT EMPLOYEE RELATIONS   )
BOARD,                   )
                         )
    Appellee.         )

Submitted: November 14, 2014
Decided: February 13, 2015

Upon Appellant's Appeal of the Merit Employee Relations Board's Decision:
**AFFIRMED.**

## OPINION AND ORDER

Joy Billings, *pro se*, 89 Pike Creek Road, Apartment 6B, Newark, Delaware 19711, Appellant.

Kevin R. Slattery, Esquire, Delaware Department of Justice, 820 North French Street, Wilmington, Delaware 19801; Attorney for the Court of Common Pleas.

**WHARTON, J.**

# I. INTRODUCTION

Joy Billings ("Appellant") filed a Notice of Appeal on March 17, 2014 requesting judicial review of the February 17, 2014 decision of the Merit Employee Relations Board ("MERB"). Appellant contends that the MERB erred in upholding her termination and rejecting her hostile work environment claims. Additionally, Appellant asserts that the MERB erred in making certain evidentiary rulings, that the process of appeal to the MERB was overly confusing and that a job post advertising the vacancy at her job position was made prematurely.

In considering the appeal, the Court must determine whether the MERB's decision to uphold Appellant's termination and reject Appellant's hostile work environment claims is supported by substantial evidence and free of legal error. Upon consideration of the pleadings before the Court and the record below, the Court finds that there is substantial evidence to support the MERB's ruling and the MERB did not err in reaching its decision. Accordingly, the MERB's decision is **AFFIRMED**.

# II. FACTUAL AND PROCEDURAL CONTEXT

Appellant was employed as an Administrative Specialist I with the Investigative Services Office ("ISO") in the Court of Common Pleas ("CCP") of the State of Delaware from January 2001 until she was terminated on December

2

10, 2012.[1] Prior to 2009, ISO employees did not receive regular performance reviews[2] but, in November 2009, a new Chief Investigative Services Officer ("Chief") was hired and he created performance plans for every ISO employee that he supervised, including Appellant, and began conducting regular performance reviews.[3] According to Appellant's first performance plan, her role was to provide administrative support for the ISO Unit.[4] Appellant's duties included: maintaining data and filing systems; composing correspondence; communicating effectively with staff, employees and the public; and executing instructions from ISO staff.[5]

In her 2010 mid-year review, Chief gave Appellant an "unsatisfactory" rating.[6] Some of the issues Chief documented in the review were that Appellant could not maintain the filing system, made numerous errors in prepared correspondence and that other co-workers had not given Appellant work for over eight months because Appellant's work product was unacceptable.[7] As a result of that review, Chief sent Appellant to professional skill development courses in May and June of 2010.[8]

---

[1] R. at 766.
[2] R. at 478
[3] R. at 479.
[4] R. at 429.
[5] *Id*.
[6] R. at 422.
[7] R. at 423-27.
[8] R. at 426-27.

Appellant also received an "unsatisfactory" rating on her next performance review which covered May 2010 through September 2010.[9] In that review Chief noted that Appellant continued to make the same errors.[10] Chief directed Appellant to attend additional professional training courses.[11] Appellant's next three performance reviews which covered September 2010 through August 2011 were all "unsatisfactory."[12] Chief detailed the same type of mistakes being made and noted that the classes seemed to have no effect on Appellant's level of performance.[13] By letter dated November 22, 2011, the Court Administrator confirmed that Appellant was on a three month period of probation for her poor job performance beginning October 26, 2011 through January 26, 2012.[14]

Around the same time, Appellant approached the Court Administrator and alleged that Chief was creating a hostile work environment.[15] Appellant contended that Chief was using the performance evaluations to harass her and that she felt she was not receiving fair evaluations.[16] Appellant also alleged that Chief had an offensive talking doll in his office that he used to harass her and that there were

---

[9] R. at 412.
[10] R. at 413-19 .
[11] R. at 419.
[12] R. at 404; 390; 381.
[13] R. at 381-410.
[14] R. at 373.
[15] R. at 532.
[16] *Id.*

offensive cartoons in the break room that contained profanities.[17] The Court Administrator investigated the incidents and Chief was required to remove the talking doll from the workplace.[18] The Court Administrator also temporarily reassigned Appellant to the CCP Costs and Fines Unit to work under a different supervisor in December 2011.[19] Appellant received another "unsatisfactory" performance review on July 5, 2012 from the Costs and Fines supervisor.[20]

In July 2012, the Court Administrator transferred Appellant back to the ISO Unit and Appellant executed a "Last-Chance Agreement" wherein she was given three months to bring her job performance up to a "meets expectations" standard and was subject to monthly performance reviews.[21] Appellant received three "unsatisfactory" ratings for each month from July 9, 2012 through October 9, 2012.[22]

By letter dated October 17, 2012, Chief recommended that Appellant be dismissed.[23] A pre-decision meeting was held on November 14, 2012 and the Court Administrator terminated Appellant's employment by letter effective December 10, 2012.[24]

---

[17] R. at 536-37.
[18] R. at 537.
[19] R. at 373.
[20] R. at 365-66.
[21] R. at 292-99.
[22] R. at 283; 275; 265.
[23] R. at 254-62.
[24] R. at 242-52.

On January 11, 2013, Appellant filed a merit system grievance appeal to both the MERB and the Office of Management and Budget's ("OMB") Human Resources Management Section.[25] On March 26, 2013, an OMB Hearing Officer upheld Appellant's dismissal[26] and Appellant pursued her appeal to the MERB. The MERB held a hearing on February 6, 2014 and issued its written opinion upholding Appellant's termination for just cause and dismissing Appellant's hostile work environment claims.[27]

**A. The Pre-Hearing Conference and Hearing**

Prior to the February 6, 2014 hearing, Appellant submitted various documents to the MERB including a brief totaling over 200 pages that was not organized.[28] In an attempt to clarify the factual and legal issues, a MERB Referee held a pre-hearing conference with the parties on September 24, 2013. The day before the pre-hearing conference, Appellant submitted several hundred pages of additional documents allegedly pertaining to her MERB hearing.[29] The Referee recommended that the MERB exclude all but thirteen pages of Appellant's initial submissions because the Referee found that they were irrelevant.[30] Additionally,

---

[25] R. at 1.
[26] R. at 431-36.
[27] R. at 765-775.
[28] R. at 221.
[29] R. at 222.
[30] *Id.*

the Referee recommended that the MERB exclude all documents submitted the day before the pre-trial conference as untimely.[31]

The Board accepted the Referee's recommendations and further limited the subject matter of the hearing to only those three performance reviews received after the "Last-Chance Agreement" was executed because the MERB determined that Appellant's failure to timely grieve the prior performance reviews precluded MERB review.[32] The MERB also permitted testimony related to the hostile work environment claim.[33]

At the February 6, 2014 hearing, the Court Administrator and Chief testified as representatives of the CCP and Appellant testified on her behalf. Appellant had requested that Arthur Stone, a former CCP colleague, be subpoenaed to testify on Appellant's behalf regarding the hostile work environment claim but Stone failed to appear at the hearing despite being properly subpoenaed.[34] The MERB determined, after hearing all of the other evidence, that Stone's testimony would not aid the MERB in rendering a decision.[35] The Court will not recount in its entirety the testimony that can be obtained from the record but will note some of the relevant portions related to Appellant's job performance and hostile work environment claim.

---

[31] *Id.*
[32] Tr. at 23: 17-23.
[33] Tr. at 26: 11-22.
[34] Tr. at 15: 19-20.
[35] Tr. at 265: 22-24; 266: 1.

i.      *Appellant's Job Performance*

Chief testified that Appellant was under a "Last-Chance Agreement" beginning in July 2012 when she returned to the ISO Unit.[36] He testified that Appellant was given three monthly reviews under the agreement and that for the first review, covering July 9, 2012 to August 9, 2012, Appellant earned an "unsatisfactory" rating because there were multiple areas in which Appellant's job performance was deficient.[37] Chief recounted incidences of incorrectly maintained case logs,[38] incorrect statistical reports[39] and major issues with Appellant's typing and correspondence skills including numerous typographical errors.[40] Chief testified that he counseled Appellant and provided her opportunities to correct her mistakes but that Appellant continually submitted "very, very poor work."[41] Chief testified that he provided the written performance review to Appellant including samples of some of the issues related to Appellant's work performance and that Appellant acknowledged that she had read and understood the performance review.[42]

Chief testified that he issued a second "unsatisfactory" monthly performance review, covering August 9, 2014 through September 9, 2014, because Appellant

---

[36] Tr. at 32:19-24.
[37] Tr. at 34: 1-7.
[38] Tr. at 36: 22-24.
[39] Tr. at 37:19-22.
[40] Tr. at 38: 13-24.
[41] Tr. at 39: 3-4.
[42] Tr. at 39: 8-19.

exhibited similar deficiencies in job performance that Chief had memorialized in the first monthly performance review.[43] Additionally, Chief testified that the final monthly review, covering September 9, 2012 through October 9, 2012, was also "unsatisfactory" for similar reasons contained in the first two monthly performance reviews.[44] He testified that Appellant acknowledged receiving all three monthly performance reviews[45] and that Appellant did not grieve any of the performance reviews.[46] Additionally, Appellant conceded that she did not grieve the negative reviews.[47]

Additionally, Chief testified that the court administration enrolled Appellant in four professional training classes to assist her in improving her work performance and simplified her job responsibilities prior to executing the "Last-Chance Agreement."[48] He stated that, ultimately, he recommended Appellant's termination because he "felt over a two-year period [the court administration] exhausted every means possible in trying to get [Appellant's] performance to meet

---

[43] Tr. at 43: 6-15.
[44] Tr. at 46: 12-18; 47:6-8.
[45] Tr. at 39:8-19; 42:23-24- 43:1; 46:22-23.
[46] Tr. at 43: 2-5; 46:24-47:2.
[47] *See* Tr. at 205:6-13. Appellant testified that she did not grieve the negative performance reviews because

> if someone gives you a really negative performance review, you could imagine you are exhausted. You have to fight for each issue in the performance review. No, I did not because it was a lot of them were in general and offensive, so I did not. I was waiting for [Chief] to write me a single written reprimand on topics…

[48] Tr. at 47:14-18.

the expectation level, the minimum expectation level for [the ISO] office. It just wasn't there."[49]

The Court Administrator testified at the hearing that she had temporarily placed Appellant in the Cost and Fines Unit prior to Appellant executing the "Last-Chance Agreement" because "there happened to be an employee out on extended leave, and so it was an opportunity for [Appellant] to be evaluated, as she had requested, by an independent evaluator."[50] She testified that Appellant exhibited the same job performance issues in that unit[51] but that she "wanted to give [Appellant] every opportunity to show [Court Administrator] that [Appellant] could do the job."[52] The Court Administrator testified that the decision to terminate Appellant was reached after a pre-decision meeting with Appellant because "it was very clear that despite training, despite training classes, on-the-job training, job shadowing, there didn't seem to be any method that could be put to use that effected any change in [Appellant's] job performance."[53] The Court Administrator asserted that Appellant's job performance was so poor that "it was either have [Appellant] sit downstairs and give her no work to do…or we had to

---

[49] Tr. at 49: 3-7.
[50] Tr. at 83: 7-18.
[51] Tr. at 85: 6-10.
[52] Tr. at 84: 21-23.
[53] Tr. at 86: 23; 87:1-3.

10

make the decision that if it wasn't going to work, that we needed to let her go and replace her with somebody who was capable of performing the job functions."[54]

### ii. *Hostile Work Environment Claim*

Appellant testified that Chief had a talking doll in his office that played various sayings including "Silence. I'll kill you."[55] She testified that Chief played it when she was nearby and she found the doll offensive because she is from an island and is not accustomed to people playing pranks on one another.[56] Appellant contended that Chief was harassing her with the doll and that the sayings were directed at her personally because Chief continued to play the offensive saying even after Appellant did not laugh, participate or otherwise indicate that she thought it was funny.[57]

Chief testified that he was given the doll as a gift from several co-workers[58] and that he was asked to remove the doll from the workplace in the fall of 2011.[59] He testified that the doll played prerecorded statements that rotated and that he had no control over which statement the doll played when he pressed the button.[60] Chief testified that after he was asked to remove the doll, he replaced the doll with

---

[54] Tr. at 87: 4-10.
[55] Tr. at 197: 22-24; 198: 1.
[56] Tr. at 198: 21-22.
[57] Tr. at 199: 1-5.
[58] Tr. at 50: 4-6.
[59] Tr. at 51: 12-14.
[60] Tr. at 57: 3-9.

11

a picture of the doll.[61] He testified that he was asked to remove the picture and he complied.[62]

Appellant also testified that she found a specific cartoon posted in a break room offensive because it contained a profanity.[63] Appellant admitted that she had not complained about the cartoon when it was posted in the old courthouse and that she had never asked for it to be removed despite seeing it since 2003.[64] Chief testified that the cartoon in the break room that Appellant complained about had been there when he became Chief and he did not post it.[65] He testified that at no time prior to lodging a formal complaint had Appellant confronted him about the doll or the cartoon.[66]

At the hearing, Appellant referenced several incidents as evidence of an alleged hostile work environment claims. She testified that Chief made her remove a religious article from her desk[67] but admitted that the item had scripture written on it.[68] She asserted that a co-worker used a racial slur when relaying a message from a member of the public in which the person identified Appellant as an

---

[61] Tr. at 51: 19-20.
[62] Tr. at 52: 2-5.
[63] Tr. at 59: 22-23.
[64] Tr. at 61: 8-24; 62:1.
[65] Tr. at 53: 13-16.
[66] Tr. at 53: 23; 54: 1-5.
[67] Tr. at 222: 17-20.
[68] Tr. at 228: 16-17.

"oriental woman."[69] Appellant conceded that a member of the public identifying her as an "oriental woman" is not a racial slur but maintained that it is a "racial issue."[70] Appellant also asserted that she was offended by a comment made to Arthur Stone that he "dresses like a pimp" because it is "a degrading sexual slur."[71] However, Appellant acknowledged that the comment was not directed at her.[72] Appellant also acknowledged that she did not report the incident to management because she did not know how Stone felt about the remark.[73] Appellant testified that Chief had distributed inappropriate birthday cards to two employees who displayed the cards on their desks in their offices.[74] She asserted that the cards offended her but acknowledged that they were not directed toward her.[75] Appellant contended that management permitted employees to play offensive music that contained profanities in the workplace but did not assert that the profanities were directed toward her.[76]

The Court Administrator testified that in the fall of 2011, Appellant contacted her and raised the issues of the doll and the cartoon.[77] She testified that

---

[69] Tr. at 230: 19-24; 231: 1-14.
[70] Tr. at 232: 9-10.
[71] Tr. at 226: 5-6.
[72] Tr. at 227: 3-5.
[73] Tr. at 15: 19-24; 16:1.
[74] Tr. at 134: 8-10.
[75] Tr. at 135: 3-4.
[76] Tr. at 180: 10-12.
[77] Tr. at 88: 18-24; 88: 1-2.

Appellant did not raise job performance evaluation issues with her at that time.[78] The Court Administrator testified that she observed the doll and posters in the workplace and made a recommendation that they be removed.[79] She testified that they were removed the same day.[80] The Court Administrator asserted that Appellant did not raise any other issues of harassment until after her pre-decision meeting when she alleged that various colleagues had sexually harassed her.[81]

### B. The MERB's Written Decision

In a decision issued on February 17, 2014, by a unanimous vote, the MERB denied Appellant's appeal.[82] The MERB found that Appellant executed the "Last-Chance Agreement" with the understanding that failure to raise her performance to "meets expectations" would result in termination.[83] The MERB also found that Appellant's performance review for the period July 9, 2012 through August 9, 2012 was unsatisfactory and that Chief had attached five single-spaced typewritten pages detailing specific instances of Appellant's job deficiencies for that period.[84] Additionally, the MERB determined that Appellant's performance reviews for the period August 9, 2012 through September 9, 2012 and for the period September 9, 2012 through October 9, 2012 were also unsatisfactory based upon the typewritten

---

[78] Tr. at 89: 3-6.
[79] Tr. at 89: 7-17.
[80] Tr. at 89: 22-23.
[81] Tr. at 90: 3-16.
[82] R. at 774.
[83] R. at 769.
[84] R. at 768.

pages attached to the reviews in which Chief detailed Appellant's job deficiencies.[85] The MERB found that Appellant acknowledged receiving all three reviews and noted on the bottom of the last two that her signature did not indicate that she agreed with the assessment of her performance but the MERB noted that Appellant did not grieve any of the three reviews.[86]

The MERB found that Chief notified Appellant of the intent to terminate her by letter dated October 17, 2012 for failing to meet the terms of the "Last-Chance Agreement" and that Appellant requested a pre-decision meeting.[87] The MERB also found that the pre-decision meeting took place on November 14, 2012 and that following the meeting, Appellant was notified by letter dated December 10, 2012 that she had been terminated from her position as an Administrative Specialist I with the CCP for failure to meet the terms of her "Last-Chance Agreement."[88]

Based upon those findings, the MERB concluded that the CCP administration had just cause to terminate Appellant for an unsatisfactory job performance pursuant to Merit Rule 12.1.[89] The MERB reasoned that the CCP

---

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *See* R. at 769. 29 *Del. Admin. C.* § 5914-12.1 states:

> Employees shall be held accountable for their conduct. Disciplinary measures up to and including dismissal shall be taken only for just cause. "Just cause" means that management has sufficient reasons for imposing accountability. Just cause requires: showing that the employee has committed the charged offense;

15

administration had spent three years offering Appellant re-training, personal counseling and transferred her to another unit and that, despite these efforts, Appellant was unable to complete her job duties which harmed the ISO Unit and other employees who had to perform additional work to compensate for Appellant's deficiencies.[90]  Moreover, the MERB ultimately concluded that "[t]he [MERB] believes that the CCP bent over backwards to try to help [Appellant] improve her job performance.  When nothing seemed to work, the agency had just cause to terminate her."[91]

The MERB also determined that Appellant did not make out a *prima facie* hostile work environment claim.[92]  The MERB found that Appellant must prove the following to make out a hostile work environment claim: 1) that Appellant suffered intentional discrimination because of Appellant's race, sex or religion; 2) that the discrimination was pervasive and regular; 3) that the discrimination detrimentally affected Appellant; 4) that the discrimination would detrimentally affect a reasonable person of the same sex, race or religion in Appellant's position; and 5) that *respondeat superior* liability existed.[93]

---

offering specified due process rights specified in this chapter; and imposing a penalty appropriate to the circumstances.

[90] R. at 769-70.
[91] *Id.*
[92] *Id.*
[93] *Id.*

16

The MERB found that although Appellant alleged that other co-workers made racial slurs toward her, Appellant failed to provide the MERB with dates, times or names of the offending employees.[94] Regarding Appellant's claim that co-workers disrespected her cultural heritage, the MERB determined that an employee memorializing a complaint in which Appellant was described as an "oriental woman" by a member of the public was not culturally or racially motivated.[95] Additionally, the MERB found that the "you dress like a pimp" comment made to Arthur Stone and the allegedly offensive birthday cards given to two employees were not directed at Appellant and had no particular racial or sexual stigma attached to them.[96] The MERB also found that the alleged offensive music played by a co-worker was not directed at Appellant personally and that Appellant never requested that the music be turned off.[97] Finally, the MERB found that where Appellant reported incidents to management, the incidents were investigated and remediated.[98]

The MERB determined that "[a]t most [Appellant] had shown a few, isolated incidents of what may have been inappropriate or insensitive conduct in the workplace by co-workers. The [MERB] does not believe that they were directed towards [Appellant] to ridicule her race, national origin, gender, or

---

[94] R. at 771.
[95] *Id.*
[96] R. at 772.
[97] *Id.*
[98] R. at 773.

religion."[99]  Moreover, the MERB concluded that "[m]ost of the incidents recounted by [Appellant] were not targeted at her race or sex or religion, or were not pervasive or regular, or were not brought to the attention of management so they would have an opportunity to investigate and, if necessary, to take prompt remedial action."[100]

## III. THE PARTIES' CONTENTIONS

Appellant characterizes the questions presented on appeal as follows:

A. Whether the Board's decision was based upon a limited acceptance by Deputy Attorney General, Tupman counsel for Merb only 54 pages of "**Written Appeal**" testimony from Appellant.  Given the Appellant's full complaint consisted of 248 pages in its totality.  '**A controversy must remain alive through the course of the appellate review.'** *Moriarty*, **588 A.2d at 1064. ' a change in the facts can render an issue or entire case moot.'(quoting Boocock, 553 A.2d at 575 n.3)**…

B. Whether the Board erred in their process of 'method of appeal' by giving conflicting instructions on the **MERB Form**.

C. Whether the OMB at the **Step 3 process** violated merit rules and employment rights with advertising the Administrative Specialist I position, prior to notifying employee of Step 3 decision.

D. Whether the Board applied Merit Rulings accordingly as their guidelines dictate.  Whereas, Merit Rule 12.2 states 'Employees shall receive a written **reprimand**

---

[99] *Id.*
[100] *Id.*

> where appropriate based on specified misconduct, or where a verbal **reprimand** has not produced the desired improvement.'

> E. Whether the Board applied '**harassment**' law according to applicable case law.[101]

However, Appellant submitted very few discernable arguments addressing the issues raised. In addition to these issues, Appellant asserts that the MERB wrongfully precluded the testimony of Arthur Stone when he failed to appear at the hearing.[102]

Counsel for the CCP contends that the MERB's decision was based upon substantial evidence and free of legal error.[103] Specifically, Counsel for the CCP argues that the MERB correctly determined that the CCP had just cause to terminate Appellant,[104] the MERB did not err in considering or applying the *prima facie* elements for a hostile work environment claim,[105] the MERB's evidentiary rulings are entitled to great deference,[106] and that arguments not raised before the MERB should not be considered by the Court on appeal.[107]

---

[101] Appellant's Opening Br. at 4.
[102] *Id.* at 7.
[103] CCP's Resp. Br. at 14.
[104] *Id.* at 15.
[105] *Id.* at 17
[106] *Id.* at 23.
[107] *Id.* at 22.

## IV. STANDARD OF REVIEW

The MERB's decision must be affirmed so long as it is supported by substantial evidence and free from legal error.[108] Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion.[109] While a preponderance of evidence is not necessary, substantial evidence means "more than a mere scintilla."[110] Questions of law are reviewed *de novo*[111] but because the Court does not weigh evidence, determine questions of credibility, or make its own factual findings, it must uphold the decision of the MERB unless the MERB "acts arbitrarily or capriciously" or its decision "exceeds the bounds of reason."[112] Furthermore, "[j]udicial deference is usually given to an administrative agency's construction of its own rules in recognition of its expertise in a given field."[113] Thus, an appellate court will not disturb an agency's interpretation of its rules unless the interpretation is "clearly wrong."[114]

## IV. DISCUSSION

As an initial matter, the Court must address the substance and form of Appellant's submissions. Although it has long been recognized that *pro se*

---

[108] *Unemployment Ins. Appeal Bd. of Dept. of Labor v. Duncan*, 337 A.2d 308, 309 (Del. 1975).
[109] *Oceanport Ind. v. Wilmington Stevedores*, 636 A.2d 892, 899 (Del. Super. Ct. 1994) (citing *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981)).
[110] *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988).
[111] *Ward v. Dep't of Elections*, 2009 WL 2244413, at * 1 (Del. Super. Ct. July 27, 2009).
[112] *PAL of Wilmington v. Graham*, 2008 WL 2582986, at *4 (Del. Super. Ct. June 18, 2008).
[113] *Div. of Soc. Servs. V. Burns*, 438 A.2d 1227, 1229 (Del. 1981).
[114] *Id*. at 1229.

litigants should be afforded some leniency in presenting their case to the Court, there is no different set of rules for *pro se* litigants to follow.[115] Moreover, "the [*pro se* litigant's] brief at the very least must assert an argument that is capable of review."[116] However, the Court prefers to decide cases on the merits where possible rather than reject submissions for procedural deficiency.[117]

Appellant filed a Record on Appeal that consisted of over eight hundred pages of transcripts and documents.[118] Additionally, Appellant filed a sixty-four page "Opening Brief" that haphazardly referenced several excerpts from what appears to be various documents, emails, personal anecdotes, CCP internal procedures and quotations to case law that allegedly pertain to her appeal.[119] In the voluminous submissions, Appellant does very little to articulate any discernible argument. Therefore, in the absence of more concrete assertions but in an effort to dispose of the case on the merits, the Court construes Appellant's arguments as follows: 1) The MERB Form for filing an appeal is confusing; 2) OMB wrongfully posted a job opening for Appellant's job position before her termination was finalized; 3) the MERB erred in affirming Appellant's termination; 4) the MERB erred in denying Appellant's hostile work environment claim; 5) the MERB erred in accepting the Referee's recommendations to limit the contents of her appeal

---

[115] *Draper v. Med. Ctr. of Del.*, 767 A.2d 796, 799 (Del. 2001).
[116] *In re Estate of Hall*, 882 A.2d 761, at *1 (Del. 2005)(Table).
[117] *City of Wilmington v. Flamer*, 2013 WL 4829585, at *4 (Del. Super. May 22, 2013).
[118] *See* D.I. 7-8.
[119] *See* D.I. 18.

submitted to the MERB; and 6. the MERB erred in concluding that the testimony of Arthur Stone, one of Appellant's witnesses, was unnecessary to render a decision.

### A. The Court Must Preclude Issues Raised for the First Time on Appeal.

When considering Appellant's arguments on appeal, the Court is limited to the record that existed at the time of the MERB's decision.[120]  Therefore, to the extent than an issue was not previously raised before the MERB, the Court cannot consider it now on the merits.[121]

Appellant's first two arguments, that the MERB appeal form is overly confusing and that OMB improperly posted a job opening for Appellant's position prior to her termination, were not raised before the MERB.  Therefore, the Court declines to address the merits of those two arguments.

### B. The MERB's Decision That the CCP Had Just Cause to Terminate Appellant is Supported by Substantial Evidence and Free of Legal Error.

Appellant asserts that she was entitled to receive and did not receive "reprimands" before being terminated in violation of Merit Rule 12.2.[122]  However,

---

[120] *See Hubbard v. Unemployment Ins. Appeal Bd.*, 352 A.2d 761, 763 (Del. 1976)("Upon appeal…the Superior Court is limited to consideration of the record which was before the administrative agency").

[121] *Id.*

[122] Merit Rule 12.2 provides, in relevant part:
> Employees shall receive a written reprimand where appropriate based on specified misconduct, or where a verbal reprimand has not produced the desired improvement.

the Court has previously considered and rejected a similar argument when it determined that performance-based terminations do not require that the employee be given progressive discipline.[123] Instead, performance-based terminations are governed by the "just cause" standard which is defined as "legally sufficient reason supported by job related factors that rationally and logically touch upon the employee's competency and ability to perform [her] job duties."[124]

Additionally, Merit Rule 12.1 defines "just cause" as "showing that the employee has committed the charged offense; offering specified due process rights specified in this chapter; and imposing a penalty appropriate to the circumstances."[125] The due process requirements regarding performance reviews are set forth in Merit Rules 13.1,[126] 13.2[127] and 13.3[128] and the due process

---

[123] *Stanford v. MERB and DHSS*, C.A. No. N10A-12-009 at 13(Del. Super. Nov. 30, 2011).

[124] *Vann v. Town of Cheswold*, 945 A.2d 1118, 1122 (Del. 2008).

[125] 29 *Del. Admin. C.* § 5914-12.1.

[126] 29 *Del. Admin. C.* § 5914-13.1 provides: "The Director shall provide for systematic performance review to communicate expectations and responsibilities, recognize achievement, and identify areas for skill development and work performance improvement."

[127] 29 *Del. Admin. C.* § 5914-13.2 provides, in relevant part: "Recognition of effort, accomplishment, improvement or the need for further skill development shall be addressed as needed by verbal discussions, written communication, and/or formal documentation."

[128] 29 *Del. Admin. C.* § 5914-13.3 provides:

> When an employee's work performance is considered unsatisfactory, the performance must be documented in writing, and the specific weaknesses must be made known to the employee. The employee shall be given documented assistance to improve by the designated supervisor. An opportunity for re-evaluation will be provided within a period of 3 to 6 months.

requirements regarding employee termination are set forth in Merit Rules 12.4,[129] 12.5[130] and 12.6.[131]

The MERB determined that the CCP had just cause to terminate Appellant from her job for consistent poor job performance because the MERB found that the CCP had spent three years offering Appellant re-training, personal counseling and transferred her to another unit before terminating her.[132] The MERB found that, despite these measures, Appellant was unable to complete her job duties and it was harmful to the ISO Unit and other employees who had to perform additional work to compensate for Appellant's job deficiencies.[133] The MERB noted that "[t]he

---

[129] 29 *Del. Admin. C.* § 5914-12.4 provides:

> Employees shall receive written notice of their entitlement to a pre-decision meeting in dismissal, demotion for just cause, fines and suspension cases. If employees desire such a meeting, they shall submit a written request for a meeting to their Agency's designated personnel representative within 15 calendar days from the date of notice. Employees may be suspended without pay during this period provided that a management representative has first reviewed with the employee the basis for the action and provides an opportunity for response. Where employees' continued presence in the workplace would jeopardize others' safety, security, or the public confidence, they may be removed immediately from the workplace without loss of pay.

[130] 29 *Del. Admin. C.* § 5914-12.5 provides: "The pre-decision meeting shall be held within a reasonable time not to exceed 15 calendar days after the employee has requested the meeting in compliance with 12.4."

[131] 29 *Del. Admin. C.* § 5914-12.6 provides: "Pre-decision meetings shall be informal meetings to provide employees an opportunity to respond to the proposed action, and offer any reasons why the proposed penalty may not be justified or is too severe."

[132] R. at 769.

[133] R. at 770.

Board believes that the CCP bent over backwards to try to help [Appellant] improve her job performance."[134]

The facts contained in the record support the MERB's ruling. Based upon the detailed testimony of Chief and Court Administrator regarding Appellant's poor job performance including several poor performance reviews, additional training opportunities provided to Appellant and a temporary transition to another unit, there is substantial evidence to conclude that Appellant lacked the job related factors required for that position. Therefore, the MERB did not err in determining that the CCP had just cause to terminate Appellant.

Additionally, the Court cannot find that the MERB was "clearly wrong" in determining that the CCP satisfied the procedural requirements set forth in the Merit Rules. There is substantial evidence in the record to support the findings that Appellant was given several systematic performance reviews pursuant to Merit Rule 13.1; in administering the performance reviews, CCP administration documented Appellant's weaknesses and gave her resources and opportunities to improve pursuant to Merit Rules 13.2 and 13.3; and Appellant was afforded a pre-decision hearing consistent with Merit Rules 12.4 through 12.6. Therefore, the Court finds that the MERB's decision to uphold Appellant's termination is supported by substantial evidence and free of legal error.

---

[134] *Id.*

**C. The MERB's Decision to Reject Appellant's Hostile Work Environment Claims is Supported by Substantial Evidence and Free of Legal Error.**

Without being particularly specific, Appellant alleges that the MERB improperly applied "harassment law."[135] To establish a *prima facie* case for a hostile work environment claim, the employee must show that: 1) the employee suffered intentional discrimination as a result of her race, sex or religion; 2) the discrimination was regular and pervasive; 3) the discrimination detrimentally affected her; 4) that a reasonable person of her likeness would be detrimentally affected; and 5) the employer is liable under the theory of *respondeat superior*.[136]

The Court finds that the MERB appropriately applied the correct legal standard and determined that "[a]t most [Appellant] had shown a few, isolated incidents of what may have been inappropriate or insensitive conduct in the workplace by co-workers. The [MERB] does not believe that they were directed towards [Appellant] to ridicule her race, national origin, gender, or religion."[137] The MERB also found that most of the incidents alleged were not brought before management and that the few reported incidents brought to management's attention were properly investigated and remediated.[138] The MERB concluded that Appellant did not make out a hostile work environment claim.[139]

---

[135] Appellant's Opening Br. at 4.
[136] *Hemphill v. Wilmington, et al.*, 813 F.Supp.2d 581, 587-88 (D.Del. 2011).
[137] R. at 773.
[138] *Id.*
[139] *Id.*

The Court finds that the record supports the MERB's conclusions. The MERB found that Appellant brought the doll and the cartoon to the attention of CCP management and that the issues were swiftly remediated.[140] Additionally, at the hearing before the MERB, Appellant conceded that some of the incidents to which she took offense were not directed at her personally but were aimed at other co-workers[141] and Appellant admitted that being referred to as an "oriental woman" by a member of the public was not a racial slur made by the co-worker who repeated the message as stated to a supervisor.[142] Furthermore, Appellant did not report any of the incidents to management besides the doll and cartoon until her pre-decision meeting.[143] Therefore, the MERB did not err in denying Appellant's hostile work environment claim and the decision is supported by substantial evidence.

## D. The Court Cannot Disturb the MERB's Evidentiary Rulings Because There Is Substantial Evidence to Support the MERB's Decision.

Pursuant to 29 *Del. C.* § 10125(b)(3), the MERB has the authority to "[e]xclude plainly irrelevant, immaterial, insubstantial, cumulative and privileged evidence." Moreover, it is clear that "[i]n dealing with evidentiary matters on appeal, this Court does not stand as the trier of fact…and, therefore, it cannot

---

[140] R. at 772-73.
[141] *See* Tr. at 227: 3-5;135: 3-4; 180: 10-12.
[142] Tr. at 232: 9-10.
[143] Tr. at 90: 3-16.

substitute its own opinion for that of the [MERB's] if there is sufficient evidence to support the [MERB's] decision."[144]

Appellant asserts that the MERB erred in accepting the Referee's recommendations to limit Appellant's submissions to the MERB and that the MERB erred in concluding that Arthur Stone's testimony would not affect the MERB's decision. Because the Court finds that the MERB's decision is supported by substantial evidence, the Court cannot evaluate evidentiary rulings that are within the exclusive province of the MERB as the trier of fact.

## V. CONCLUSION

The Court finds that the MERB's decision is supported by substantial evidence and free from legal error. Therefore, the decision of the MERB is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

_____
**/s/** Ferris W. Wharton, Judge

---

[144] *Lopicko v. Del. Dep't of Servs. For Children*, 2003 WL 21976409, at \*3 (Del. Super. Aug. 15, 2003).